S. William GREEN, Justin Colin and Roger J. Hochstin, Plaintiffs,

v.

HAMILTON INTERNATIONAL CORPORATION, MEI Corporation and Household Finance Corporation, Defendants.

No. 76 Civ. 5433 (CHT).

United States District Court, S. D. New York.

Sept. 29, 1977.

Milgrim Thomajan & Jacobs, P. C., New York City, for plaintiffs; Robert F. Fink, Robert A. Meister, New York City, of counsel.

Cadwalader, Wickersham & Taft, New York City, for defendants; George D. Reycraft, Richard J. Wiener, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

In this civil action for money damages plaintiffs allege a violation of Section 10(b) of the Securities Exchange Act of 1934 ("the '34 Act"), 15 U.S.C. § 78j and rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder. Plaintiffs also claim a cause of action in common law fraud for which they ask punitive damages.

Defendants have moved to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rules") and for a protective order against discovery under Rule 26(c) pending determination of the motion to dismiss. Plaintiffs, in turn, have moved to compel discovery under Rule 37. For the reasons stated herein the motion to dismiss is denied; the cross-motions to stay or to compel discovery are therefore dismissed as moot.

Although defendants have submitted affidavits in support of their motion to dismiss, these fail to resolve all issues of material fact and thus cannot give rise to summary judgment under Rule 56. Therefore, matters outside the pleadings will be excluded in considering the motion to dismiss under Rule 12(b)(6), and the allegations of the complaint will be accepted as true.

## FACTS

The instant case raises an interesting issue: whether the redemption of convertible debentures in the ordinary course of their maturity can, under certain circumstances, effect a fraud cognizable under federal securities law.

Plaintiffs S. William Green, Justin Colin and Roger J. Hochstin owned convertible debentures of defendant Hamilton International Corporation ("HIC") having, in the

726

aggregate, a redemption value of $300,000. The redemption date for the debentures was October 31, 1976. The debentures provided, however, that at any time before 3:00 p. m., E.S.T., on that day, they could be converted in whole or part into shares of HIC common stock at the conversion rate of $2.25 per share. Complaint ¶ 10. In the two weeks before the redemption date, HIC common stock was publicly trading at a price well below the conversion rate. *Id.* ¶ 12. It is alleged that defendant HIC knew during this period that plaintiffs would elect to redeem rather than to convert. *Id.* ¶¶ 16–19.

█ Redemption actually occurred on November 1, 1976. Defendants insist that the one-day lapse was a matter of convenience, since October 31, 1976 was a Sunday; plaintiffs claim that the delay gave them a one-day extension on their conversion option. On November 1, 1976 defendant Household Finance Corporation ("HFC") delivered a written offer to HIC proposing to acquire the latter corporation by purchasing outstanding shares at $4.00 per share. News of this offer was released to the public on November 4, 1976. Plaintiffs, having surrendered the opportunity to purchase shares of stock at the equivalent of $2.25 per share when they redeemed their debentures and therefore having lost the chance to participate in the merger at the price of $4.00 per share, demanded rescission of the redemption transaction, which was refused. Plaintiffs then commenced this action, contending that HFC, HIC and MEI Corporation ("MEI"), the latter owning approximately 27% of HIC voting stock,[1] conspired to violate through silence the letter and spirit of section 10(b) and rule 10b–5 by concealing alleged pre-November 1 merger negotiations in order to prevent plaintiffs from acquiring information which would encourage them to con-

vert rather than redeem. Defendants respond that the debentures were redeemed strictly according to their terms and without "prodding" by defendants. Defendants' Memorandum 6. Defendants acknowledge only that "HIC received the written offer of merger from HFC on November 1," 1976, assert that the decision to announce the HFC merger offer on November 4 was made in the exercise of "reasonable business judgment," *id.* at 7, and deny that under the circumstances they actually breached or could have breached any duty to plaintiffs.

### ALLEGED 10b–5 VIOLATION

The advantage to defendants accruing from plaintiffs' decision to redeem their debentures is obvious: HIC was not required to issue shares to cover a conversion and HFC was not required to consider the value of those shares in calculating its merger offer price. The question at bar is whether this advantage was gained at the expense of fidelity to the federal securities law.

Rule 10b–5 makes it unlawful for any person using the instrumentalities of interstate commerce

"(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

1. Plaintiffs characterize MEI as a "controlling person" within the meaning of Section 20 of the '34 Act, 15 U.S.C. § 78t. In addition to its share ownership, MEI is alleged to have at least five representatives on the 16-person HIC Board of Directors. For purposes of this Rule 12(b)(6) motion, the allegation is taken as true.

Since the statute is cast in subjective terms— "(a) Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule thereunder shall also be liable," *id.* § 78t(a)—the question of control would be more properly addressed after discovery has taken place.

At the threshold, defendants maintain that plaintiffs do not fall within the ambit of 10b–5 protection because the transaction complained of was not a "purchase or sale of any security." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir.), *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952). A careful reading of the statute and of *Blue Chip* does not support this view. Section 3(a)(10) of the '34 Act, 15 U.S.C. § 78c(a)(10), includes in the definition of a "security" "any . . . debenture." Subsection (13) of the same section states: "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire." Subsection (14) defines the terms "sale" and "sell" to "include any contract to sell or otherwise dispose of." The *Blue Chip* Court specifically acknowledged that holders of contractual rights to purchase have standing to sue, in contradistinction to the *Blue Chip* plaintiffs who were merely nonpurchasing offerees.

> "Unlike respondent, which had no contractual right or duty to purchase Blue Chip's securities, the holders of puts, calls, options, *and other contractual rights or duties to purchase or sell securities* have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b–5, not because of a judicial conclusion that they were similarly situated to 'purchasers' or 'sellers,' but because the definitional provisions of the 1934 Act themselves grant such a status." *Blue Chip, supra*, 421 U.S. at 751, 95 S.Ct. at 1932 (emphasis added).

In the instant action, plaintiffs were, before the date on which they redeemed, clearly possessed of a "contractual right" to acquire HIC stock and thus entitled to 10b–5 protection.

Likewise, 10b–5 coverage also extended to the redemption transaction. The Second Circuit has held that the redemption of debentures by a corporation is "a 'purchase' within the meaning" of section 10(b) and rule 10b–5. *Drachman v. Harvey*, 453 F.2d 722, 737 (2d Cir. 1972) (en banc). In the *Drachman* case plaintiff shareholders sued under 10b–5 alleging a conspiracy by Harvey Aluminum Incorporated and Martin Marietta Corporation to transfer control of the former to the latter by means of a scheme which included, inter alia, the improvident redemption of certain convertible debentures. A Second Circuit panel had rejected the idea that this particular redemption fell afoul of securities law, reasoning that the redemption transaction itself was carried out strictly according to the terms of the indenture agreement and therefore was not "in connection with" the alleged fraud. On rehearing en banc, the full court reversed the panel, feeling itself bound by the expansive reading of 10b–5 protection in *Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971), where the Supreme Court found a 10b–5 violation in another facially legitimate securities transaction conducted in the course of a plan to defraud. In its discussion, the *Bankers Life* Court directed that section 10(b) "be read flexibly, not technically and restrictively. Since there was a 'sale' of a security and since fraud was used 'in connection with' it, there is redress under § 10(b)." *Id.* at 12, 92 S.Ct. at 169.

Defendants here seek to distinguish the holding in *Drachman* on the ground that there was "no connection between the normal expiration of [plaintiffs'] right to redeem or convert the Debentures and the alleged fraud." Defendants' Memorandum 5. This contention can hardly be serious. The redemption transaction is at the *core* of the fraud complained of and surely such a fraud would be no more praiseworthy for being unconnected with a larger scheme. Moreover, this argument ignores the breadth of the *Bankers Life* decision, which found "10(b) to mean that Congress meant to bar deceptive devices and contrivances in the purchase or sale of securities whether conducted in the organized markets or face to face." *Bankers Life, supra*, 404 U.S. at 12, 92 S.Ct. at 169. This is still the controlling principle in securities fraud litigation. *Blue Chip* did no more than emphasize that

it is a narrow class which benefits from this broad remedial purpose.

In the opinion of this Court, the November 1, 1976 bond redemption transaction was a "purchase" by HIC and plaintiffs' standing to sue is not impaired by the strict interpretation of the "purchaser-seller" rule in *Blue Chip*.

 Defendants' next argument is that no actionable fraud can be found in that HIC was entirely "passive" in the redemption transaction and that plaintiffs made a "free and unfettered choice [to redeem] . . . with all the information then known by the investing public." Defendants' Memorandum 6. The "passivity" suggestion is unpersuasive. First, rule 10b–5 by its terms proscribes *omissions* which are misleading. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); *SEC v. Shapiro*, 494 F.2d 1301 (2d Cir. 1974); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Furthermore, it can make no difference whether defendants gained a prohibited advantage by exercising an option to redeem, as in *Drachman, supra*, or by sitting back to wait for the passage of time to accomplish the same end, as in the instant case.

The heart of the matter is exposed by defendants' second statement alluding to information available to the public on the bond redemption date. The question is whether the timing of the merger offer was deliberately orchestrated to deprive plaintiffs of material[2] information within the meaning of 10b–5, and whether such con-

duct, if proven, violated the rule.[3] This, in turn, leads to the question of the insiders' duty to disclose. This Court has stated, based on the controlling authority in this Circuit, that the "duty arises when one in possession of material inside information decides to trade or recommend the securities concerned. *SEC v. Texas Gulf Sulphur Co.*, supra, 401 F.2d 833, 848." *Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 353 F.Supp. 264, 276 (S.D.N.Y.), *aff'd*, 495 F.2d 228 (2d Cir. 1974). The rule enunciated in *Texas Gulf Sulphur* is that

> "anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or if he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed."

*SEC v. Texas Gulf Sulphur Co.*, supra, 401 F.2d at 848. The "disclose or abstain" rule follows ineluctably from the purpose behind section 10(b) and rule 10b–5, which, as the Second Circuit has stated "time and again," "is to protect the investing public and to secure fair dealing in the securities markets by promoting full disclosure of inside information so that an informed judgment can be made by all investors." *Shapiro v. Merrill Lynch, Pierce Fenner & Smith, Inc.*, supra, 495 F.2d at 235.

 Furthermore, there can be no doubt that the prohibition against "insider" trading extends to a corporation. It was said early of the '34 Act's "fair play" philosophy that it applies "not only to majority stockholders of corporations and corporate

---

**2.** It is clearly "material," within the accepted definition of the term, that HFC intended to offer nearly double the bond conversion rate for each HIC share. "The basic test of materiality . . . is whether a *reasonable* man would attach importance . . . in determining his choice of action in the transaction in question." *SEC v. Texas Gulf Sulphur Co., supra*, 401 F.2d at 849, *quoting List v. Fashion Park, Inc.*, 340 F.2d 457, 462 (2d Cir. 1965).

**3.** This analysis puts to rest, at least for purposes of the motion to dismiss, defendants' contention that plaintiffs would have been im-

permissible "tippees," *SEC v. Texas Gulf Sulphur, supra*, had HIC revealed to them the HFC merger offer prior to informing the public. However, assuming arguendo that HFC's merger offer came unheralded on November 1, 1976, and accepting as true plaintiffs' allegations that their option to convert was still viable on November 1 and that redemption occurred *after* receipt of the merger offer, Complaint ¶¶ 21, 26, 27, HIC could have avoided its own possible "inside" trade and the "tippee" problem by rescinding the redemption transaction once the merger offer was made public.

insiders, but equally to corporations themselves when acting through their officers, directors or agents." *Kohler v. Kohler Co.,* 319 F.2d 634 (7th Cir. 1963); *see SEC v. Geon Industries, Inc.,* 531 F.2d 39 (2d Cir. 1976); *Drachman v. Harvey, supra; SEC v. Texas Gulf Sulphur Co., supra.* By redeeming its own debentures, HIC "traded" in its own securities. If it concealed material information in this transaction with intent to defraud plaintiffs, *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and if MEI and HFC joined in the scheme, then a legitimate 10b-5 claim has been stated against all defendants.

## COMMON LAW FRAUD

In the absence of a fiduciary relationship,[4] the plaintiff alleging common law fraud based on the failure to disclose must show "at least that the defendant knew that the plaintiff was acting under a mistaken belief with respect to a material fact." *Frigitemp Corp. v. Financial Dynamics Fund, Inc.,* 524 F.2d 275, 282 (2d Cir. 1975) (citation omitted). This is precisely what is alleged. Plaintiffs' entire theory is that defendants timed the HFC merger so that plaintiffs would act upon the only information then available to them, *i. e.,* the $2.25 conversion price and the then-current price of HIC stock. Although the plaintiffs' allegations rest only upon "opinion and belief," that ground may be sufficient to meet the requirement of Rule 9(b) that fraud be pleaded with particularity where no discovery has yet been had and where the facts to support the claim are peculiarly within the knowledge of the corporate defendants. *See Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 379 (2 Cir. 1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975); *Schoenbaum v. Firstbrook,* 405 F.2d 215, 218 (2d Cir. 1968) (en banc), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969).

## CONCLUSION

The assessment of a Rule 12(b)(6) motion is a "limited [task]. The issue is not whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). In the opinion of this Court the facts alleged—the written offer of merger on November 1, 1976, the contemporaneous redemption of the bonds at the conversion rate, and the prospective financial advantage to defendants—raise questions that cannot be dismissed at this time. It does not appear "beyond doubt that the plaintiff can prove no set of facts in support of his claim." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Accordingly, defendants' motion to dismiss is denied; the cross-motions to stay or to compel discovery, predicated as they are on the resolution of the substantive motion, are now moot and are therefore dismissed.

So ordered.

4. This is not to say that no breach of fiduciary duty occurred if the facts are as plaintiffs have alleged. As holders of convertible debentures, plaintiffs were part of "the entire community of interests in the corporation—creditors as well as stockholders" to whom the fiduciary duties of directors and controlling shareholders run. *Pepper v. Litton,* 308 U.S. 295, 307, 60 S.Ct. 238, 245, 84 L.Ed. 281. The Second Circuit has recognized the special nature of a convertible debenture in the following terms:

"What one buys when purchasing a convertible debenture in addition to the debt obligation of the company incurred thereby is principally the expectation that the stock will increase sufficiently in value that the conversion right will make the debenture worth more than the debt. The debenture holder relies on the opportunity to make a proper conversion on due notice."

*Van Gemert v. Boeing Co.,* 520 F.2d 1373, 1385 (2d Cir. 1975). Although the issue in *Van Gemert* was the failure of Boeing to give reasonable notice of a "call" on debentures, with the result that certain holders lost a profitable right to convert, the investment "expectations" of debenture holders are no less defeated if notice is timely but information is inaccurate.